# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| ALICIA N. JACOBSON,         )<br>   Plaintiff                  )<br>                               )<br>v.                               )<br>                               )<br>KILOLO KIJAKAZI,[1]   )<br>**Acting Commissioner of Social**   )<br>**Security,**                     )<br>   Defendant            )| Civil Action No. 2:20cv00030<br><br>**REPORT AND**<br>**RECOMMENDATION**<br><br>By:  PAMELA MEADE SARGENT<br>      United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Alicia N. Jacobson, ("Jacobson"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq*. Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Jacobson protectively filed her application for DIB on May 3, 2018, alleging disability as of January 1, 2006, based on narcolepsy, anemia, hiatal hernia, anxiety, depression, bipolar disorder, nerve damage in left arm and hand, tachycardia, asthma, gastrointestinal problems, severe muscle cramps and valgus malformity. (Record, ("R."), at 174, 183-84, 222.) The claim was denied initially and upon reconsideration. (R. at 73-101, 104-05, 110-12, 114-16.) Jacobson then requested a hearing before an administrative law judge, ("ALJ"). (R. at 117-18.) The ALJ held a hearing on January 14, 2020, at which Jacobson was represented by counsel. (R. at 38-72.)

By decision dated February 14, 2020, the ALJ denied Jacobson's claim. (R. at 12-26.) The ALJ found Jacobson met the nondisability insured status requirements of the Act for DIB purposes through only December 31, 2007.[2] (R. at 12, 14.) The ALJ found Jacobson had not engaged in substantial gainful activity from January 1, 2006, through December 31, 2007, the date last insured. (R. at 14.) The ALJ determined that, through the date last insured, Jacobson had severe impairments, namely narcolepsy, depression, anxiety, sleep apnea, valgus deformity in both feet and obesity, but he found Jacobson did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-18.) The ALJ found that, through the date

---

[2] Therefore, Jacobson must show she was disabled between January 1, 2006, the alleged onset date, and December 31, 2007, the date last insured, to be eligible for benefits.

last insured, Jacobson had the residual functional capacity to perform sedentary[3] work, except she could never climb, crawl or have exposure to work hazards of a danger nature, such as heights and moving machinery parts. (R. at 19). The ALJ found that Jacobson was able to maintain attention and concentration for simple, repetitive tasks involving short, simple instructions, would be off-task no more than 10 percent of the workday apart from ordinarily scheduled breaks, would be expected to incur up to one unscheduled absence from work every two months and could have no required public interaction. (R. at 19.) The ALJ found that Jacobson was unable to perform any past relevant work through the date last insured. (R. at 24.) Based on Jacobson's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Jacobson could perform, including the jobs of a document preparer, a touch-up screener and a stuffer. (R. at 24-25.) Thus, the ALJ concluded Jacobson was not under a disability as defined by the Act from January 1, 2006, through December 31, 2007, and she was not eligible for DIB benefits. (R. at 26.) *See* 20 C.F.R. § 404.1520(g) (2020).

After the ALJ issued his decision, Jacobson pursued her administrative appeals, (R. at 170-73), but the Appeals Council denied her request for review. (R. at 1-3.) Jacobson then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2020). This case is before this court on Jacobson's motion for summary judgment filed April 29, 2021, and the Commissioner's motion for summary judgment filed June 1, 2021.

---

[3] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing often is necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2020).

*II. Facts*[4]

Jacobson was born in 1976, (R. at 24), which, on the date last insured, classified her as a "younger person" under 20 C.F.R. § 404.1563(c). She has a high school education. (R. at 25.) Jacobson has past work experience as a licensed practical nurse. (R. at 24.) Jacobson testified that she last worked as a nurse in 2006. (R. at 46.) During the five to six years that she worked as a nurse, Jacobson said that she suffered from panic attacks, anxiety and excessive sleepiness. (R. at 46-47.) Jacobson said that she was so sleepy while working that she could not focus. (R. at 47.) When she felt this way, she said, she would begin to feel anxious and experience an anxiety attack. (R. at 47.) Jacobson testified that, while working, she experienced daily episodes when she was "foggy or not responsive." (R. at 48.) She said she was sometimes late for work because she would have to pull off the road due to her sleepiness. (R. at 50.) At work, she said that she could not complete tasks such as charting due to her becoming "groggy." (R. at 51.)

Jacobson testified that, due to the stress of trying to stay awake at work, she once gave a patient the wrong medicine. (R. at 52.) When she would have anxiety attacks, she said, her heart raced, she would sweat, and she would have to sit down for a minute, but she would end up falling asleep. (R. at 56-57.) Jacobson testified that she would have three to four such attacks in an eight-hour shift. (R. at 57.) Jacobson said that, during this period of time, she sought counseling with Patricia Owens, but her treating neurologist, Dr. Dengler prescribed her medication for depression. (R. at 58-60.)

---

[4] Jacobson challenges only the ALJ's finding as to her mental residual functional capacity. Therefore, the facts presented focus on her mental impairments.

In rendering his decision, the ALJ reviewed records from Johnson City Medical Center; Appalachian Family Care; Norton Community Hospital; Foot and Ankle Center; Tri-State Mountain Neurology Associates, P.C.; Mountain Empire Surgery Center; Gastrointestinal Associates; Tri-Cities Gastroenterology; Dr. Ashley Bevins, D.O.; MSMG – Primary Care Center – Abingdon; John Ludgate, Ph.D.; Dr. Jolanta Herrera, M.D.; Patricia Owens, L.P.C.; Shellie Crockett, F.N.P.; Dr. Michael Hodge, M.D.; Mountain States Health Alliance; Franklin Woods Community Hospital; Ava Martin, P.M.H.N.P.; Crystal Burke, L.C.S.W.; and Surgical Group of Johnson City. Most of these medical records, however, are not from the relevant period prior to December 31, 2007, Jacobson's last date insured.

Records from St. Mary's Outpatient Clinic show that Jacobson treated there from 2001 to 2004. (R. at 884-903.) A medication list, dated from June 2001, lists Jacobson's diagnoses as narcolepsy and depression. (R. at 902.) This list does show that Jacobson was prescribed Effexor, Ritalin, Lexapro and Prozac at times. (R. at 902.) A medical report, dated September 24, 2003, and signed by J. Dingus, L.P.N., states that Jacobson was prescribed Ritalin. (R. at 890.) A July 18, 2003, record, signed by Joyce Jessee, L.P.N., states that Jacobson was prescribed Lexapro. (R. at 892.) A medical report, dated January 9, 2004, states that Jacobson was there for reassessment of anxiety and agitation. (R. at 888.) The record appears to have been signed by a nurse, but the signature is not legible. (R. at 888.) None of the other records make any reference to a diagnosis or treatment for narcolepsy, depression or anxiety. None of the medical records from this provider place any limitations on Jacobson's mental work-related abilities.

Medical records from Tri-State Mountain Neurology Associates, P.C., show that Jacobson was treated there from 2004 to 2013. (R. at 324-30, 922-32.) In March 2004, Jacobson was diagnosed with hypersomnia. (R. at 926.) On April 19, 2004,

Dr. John M. Dengler, M.D., prescribed Adderall for a diagnosis of narcolepsy. (R. at 925.) None of the medical records from this provider for the relevant period place any limitations on Jacobson's mental work-related abilities.

Jacobson also treated with Shelli Crockett, N.P., from March 2007 to March 2008. (R. at 909-19.) On March 30, 2007, Crockett listed Jacobson's diagnoses as fatigue, narcolepsy and depression. (R. at 909.) On April 20, 2007, Crockett listed Jacobson's diagnoses as narcolepsy and obesity; depression was not listed. (R. at 910.) On June 25, 2007, Crockett listed Jacobson's diagnoses as gastroesophageal reflux disease, ("GERD"), and right knee pain. (R. at 911.) Crockett continued to see Jacobson through March 2008 for various physical ailments, including GERD and obesity, but there is no further mention of depression. (R. at 912-19.) She did include narcolepsy in Jacobson's diagnoses on March 27, 2008. (R. at 919.) None of the medical records from this provider place any limitations on Jacobson's mental work-related abilities.

The record also includes a check-box form completed by John Ludgate, Ph.D., of Lebanon Medical Group, P.C., on November 23, 2004. (R. at 882.) This form indicated that, based on an interview, Jacobson suffered from a generalized anxiety disorder, bipolar disorder unspecified, paranoia and obsessive/compulsive disorder. (R. at 882.) The form contains no findings to support these diagnoses and contains no opinion regarding the effect of these diagnoses on Jacobson's work-related abilities.

The record also includes a work excuse signed by Patricia Owens, L.P.C., on November 17, 2006, which stated: "This is to certify that the above-named person is under my professional care and is unable to work at this time. It is estimated that this client will have recovered sufficiently to return to work on or about Dec[ember] 4

2006." (R. at 904.) This excuse does not list any diagnoses or impairments or any other findings to support Owens's conclusion.

Crystal Burke, L.C.S.W., completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) for Jacobson on December 30, 2019. (R. at 958-60.) On this assessment, Burke opined that Jacobson had marked or serious limitation with substantial loss of the ability to function resulting in unsatisfactory work performance in her ability to deal with work stresses, to maintain attention/concentration and to understand, remember and carry out complex job instructions. (R. at 958-59.) In all other areas of making occupational, performance or personal/social adjustments, Burke opined that Jacobson could still function satisfactorily. (R. at 958-59.) Burke also opined that, on average, Jacobson would miss more than two days a month from work as a result of her impairment or treatment. (R. at 960.) Burke did not list any limitations or medical/clinical findings to support her opinions. (R. at 958-60.) Based on the record, Burke saw Jacobson for behavioral health treatment from July 10 to November 26, 2019. (R. at 935-57.)

---

On reconsideration, Stephen P. Saxby, Ph.D., on December 6, 2018, completed a PRTF, stating that Jacobson suffered from depressive, bipolar and related disorders. (R. at 94.) Saxby said that the record contained insufficient information to determine whether these disorders caused any limitations for Jacobson. (R at 94.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62

(1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Jacobson argues the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.) In particular, Jacobson argues that the ALJ erred by not crediting the opinion evidence from licensed clinical social worker Burke. (Plaintiff's Brief at 5.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 404.1520c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[11]

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case

---

[11] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2020).

record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2020).[12] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an

---

[12] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. § 404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

Jacobson argues the ALJ erred by rejecting Burke's opinion that Jacobson had severe limitations in her ability to deal with work stresses and maintain attention/concentration and that Jacobson would be absent from work more than two days a month. (Plaintiff's Brief at 5.) The problem with this argument is that Burke's opinions were contained in a December 2019 assessment of Jacobson's work-related abilities – an assessment completed approximately 12 years after Jacobson's last date insured. The ALJ properly found Burke's opinion unpersuasive because it did not contain any evidence that Jacobson's limitation existed during the relevant time period from January 1, 2006, to December 31, 2007. (R. at 24.) Based on this, I can find no error with the ALJ's consideration of Burke's opinion.

In fact, the record in this case contains no evidence from any of Jacobson's health care providers concerning her mental work-related abilities or any mental limitations for the relevant time period. The only evidence contained in the record

-11-

concerning Jacobson's work-related mental abilities for the relevant time period are from the state agency psychologists, Carne and Saxby. Carne stated that Jacobson's mental impairments caused no limitation in Jacobson's ability to understand, remember and apply information or to adapt or manage herself and only mild limitation in her ability to interact with others and to concentrate, persist or maintain pace. (R. at 79.) Saxby stated that the record contained insufficient information to determine whether Jacobson's mental impairments caused any limitations for Jacobson during the relevant period. (R. at 94.)

Nonetheless, the ALJ, crediting Jacobson's testimony, at least in part, regarding her mental impairments for the relevant time period, found that Jacobson was able to maintain attention and concentration for only simple, repetitive tasks involving short, simple instructions, would be off-task no more than 10 percent of the workday apart from ordinarily scheduled breaks, would be expected to incur up to one unscheduled absence from work every two months and could have no public interaction. (R. at 19.)

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Jacobson was not disabled

under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Jacobson's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:	February 4, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-14-